Good morning. Each of you have 15 minutes to speak to your side of the appeal, and we're assuming you'd like to reserve some time for rebuttal. Is that correct, sir? Yes, Your Honor. I'd like three minutes or so. Okay, great. You can begin when you're ready. Thank you. May it please the Court, once again, Pete Skro for the appellant Urbano-Perez. I would like to focus on Issue 2, the eavesdropping statute, and, if possible, Issue 4, the immigration bias. I'd be happy to answer any other questions about the other issues. The question for this Court is whether Detective Cepeda violated the eavesdropping statute when he used the intercom system to listen in onto Urbano-Perez's conversation in the lineup room. I think the facts establish that he clearly did. First of all, he testified that he could not have heard him without the aid of this intercom system. A eavesdropping device is any device capable of hearing or recording any oral communication. A conversation is defined as any oral communication between two or more people, whether or not they intend the conversation to be private or whether or not they have any expectation that this conversation is private. Counsel, can I ask you a question about that? Sure. I'm trying to imagine this room, the room where the lineup took place. Is there a box of some kind showing that it's an intercom? I mean, is it visible to the people in the lineup? There is no testimony in the record that I'm aware of expressly describing how you could see the intercom system. I do think the intercom system can be either on or off. But if he looks up and he sees a box, like a PA box like we had in school, and he sees that and he makes a comment, is there an understanding that it may be getting communicated to somebody in another room? Unless he never watched TV in his life, he knows it's a two-way room, two-way window, right? Well, I think if you're getting into the area of implied consent, and I don't think that that would be implied consent because he clearly did not know that he was being listened to. I mean, I think everyone knows. How do we know that? I mean, you're making a definitive statement. How do we know that he didn't know that he was going to be? You're in a room with people you don't know in the lineup, the fillers, I assume, and you're standing there with other people and you say something, whether it's Spanish or English, anyone could overhear you. So where is his understanding or expectation that this is a private conversation? Where does that come from? Well, first of all, the statute doesn't require you to have any expectation of privacy. I think that's one thing to keep in mind. So his expectation of privacy is irrelevant. The question is whether this recording device using this intercom system violated the statute. I think from the circumstances, you can clearly see that he did not know he was being listened to because he made incriminating statements. I think that it's fairly logical and rational to assume that people don't make incriminating statements if they think someone's listening. Moreover, Detective Cepeda testified, unbeknownst to them, I was listening in. So I think when you combine those two factors, it's clear he did not know he was being listened to. And your question goes to implied consent, and I think people v. Ceja deals with implied consent. And I'd like to know, you know, that Ceja obviously holds that this statute applies in a custodial situation. I mean, they did not say that just because you're in jail or custody that the statute doesn't apply. But Ceja held that there was implied consent, but the factors were much, much more. I think we all agree if he's alone in a room and there's a bug in the room or he picks up his cell phone and calls somebody or something, that that would be, I agree with you, that would be a violation of the eavesdropping statute. I think we all agree with that. This is somewhat different. He's standing in a lineup with another, with a group of people. There are other people in the room, and he makes an incriminating statement. Is he implicitly saying, I'm agreeing to have other people overhear this? I don't think that. He's making a private statement. It's not like he's speaking to a friend on the phone in a room by himself. That's different. Well, I think that as this statute makes explicitly clear, you do not look to whether anyone has an expectation of privacy. But can you, can you, the State's going to say, no, you have to interpret this statute against the backdrop of the Fourth Amendment, and in the Fourth Amendment analysis, you've got a reasonable expectation of privacy. I mean, it's a public building. I mean, do we have a reasonable expectation of privacy in this building? Never? No. Right? None of us here. Anything we say is probably being listened to because it's a public building. So even though the statute doesn't say it, are you saying the statute does not specifically adopt a reasonable expectation of privacy language, and as a result, that is not a part of the analysis at all? The statute explicitly says that it does not matter if you have a reasonable expectation of privacy. The definition of conversation even says whether or not one has an expectation, a justifiable expectation that the conversation is private. So there is absolutely no room in the statute for. What does the legislative history say? Does it indicate that in public buildings the statute doesn't apply? Well, we do know that they amended the statute in 1994 to make it, to require the express consent of all the parties to a conversation, which clearly puts it greater protection in federal law. Under Fourth Amendment jurisprudence, one person could be wired, and if, you know, that would not violate the Fourth Amendment. In Illinois, we've provided, and all of the cases recognize that. People v. Nesterov says whether or not intended to be private, that's what this statute explicitly says. And Coleman acknowledges that the Illinois legislature, the federal Congress allowed for concurrent legislation, and Illinois decided to pass a stringent eavesdropping statute. And I think. Did anything prevent the officer from making an announcement or mirandizing the people in the room over the intercom that anything they said might be used against them? Well, I think that that would be something that could maybe go to implied consent. If he had done that, then we would have a situation more like Seha. Whereas in Seha, the court didn't hold the statute didn't apply to this custodial setting. The court held that in Seha, the person who was monitoring the conversation repeatedly told them, I can hear you, shut up. She even went and had a face-to-face conversation and said, I can hear you. You keep talking. I can hear you. Not to mention there was a pain going on. There was lots of factors. And the two suspects in that case, even after she said, I can hear you, said, oh, they can hear us. So they even acknowledged. So I think that, you know, implied consent could be found in Seha. It can't be found here. The circumstances clearly show he did not know he was being heard. Like, you know, once again, I don't think he would have made these comments if he was aware that he was being listened in on. They did in Seha. I mean, they were told. And they kept talking, kept going. Sure. And I think the nature is a strange thing. You know, people confess to things all the time and, you know, making criminal statements all the time. Sure. But I think you have to have some factors to look to towards implied consent. In Seha, you have a whole lot of factors that there is no way anyone could look at that and say they didn't know. When you are told repeatedly, we are listening in, this is Detective Cepeda testifying, they did not know. Now, you're right, that doesn't necessarily 100% prove. But I think it's pretty clear that. Hadn't he been Mirandized by this time? He had been Mirandized. He had been Mirandized, yes. But you've been told anything you say can and will be used against you. But Miranda, you have to look at Miranda applies to custodial interrogation. Miranda is protections because of the inherent, coherent. Well, what do you consider a line-up? Do you consider that to be part of the custody, obviously? Is it part of the investigation, if not interrogation? Well, it's not. You're standing in a line-up at a police station and you're making statements that are incriminating. And you think you're entitled to have that be private? Well, once again, I don't think, first of all, Miranda applies to interrogation, not listening in. And I think that the statute has a lot of exemptions. I poured over them trying to make sure that there was not an exemption I was missing. The statute does not require that there to be any Fourth Amendment violation, any expectation of privacy, any idea that, well, you know, you're in a jail, well, then you're going to get overheard. In fact, there is an exemption for penal code electronic communication, which electronic communication is different. Electronic communication has to have, because both parties have to intend it to be private, for it to be covered by the statute. Let me ask you, because we have to write this, let's say we go with your analysis and we forget about the Fourth Amendment analysis and we just look at the statute, and it sounds as if your analysis hinges on they didn't know. And that's what we're hinging this on. You know, this person didn't know. Just go with me for a second. Okay. Walk down the road with me. What does that do in the future for Menard state bill? Are you saying, I mean, if we write it that way and the eavesdropping statute applies to this situation, obviously it would apply to a state penitentiary, right? Yes, Your Honor. It would apply to every jail. It does, and there's exemptions. There's a lot of exemptions that allow law enforcement various, you know, things to do. There's a lot of exemptions. There is a penal code, a penal institution exemption that deals with, like I said, electronic communication. The legislature has amended the statute constantly. Recently, in 2010, it was never amended. But it would apply to the rest of the state penitentiaries, and it looks like the statute is predicated on you're talking about the knowledge of the person. Your Honor, I think we're getting a little off course here. The knowledge really has only to do with implied consent. The knowledge, in fact, the statute explicitly says you can have two people talking that have no expectation and no intention that their conversation is private, and you cannot overhear the conversation. So I think that writing this opinion is just following the statute. There is no exemption for this. Say how it recognizes that this statute applies in a custodial situation. There was just a plethora of evidence on the record to say, well, these guys impliedly consented. We do not have that much evidence, or any evidence, really, of any sort of implied consent here, other than the idea that, you know, someone may – but, I mean, if you were to go with that, I think you would frustrate the purpose of the statute, because then it's like they didn't – they created one specific exemption for penal institutions. So are they supposed to now be allowed to listen in on any conversation in the penal institution? I mean, the legislature is free to provide that sort of – There's no expectation of privacy in a penal institution. You're in jail. I mean – The reason – They would – I mean, under that analysis, they have more reasonable expectation of privacy than we do, because we're in a public building. We have no reasonable expectation of privacy in a public building, right? This isn't my building. It's not your building. So, I mean, under that analysis, they probably have more protection than we do, which is an interesting – No, but you would be – provide the same protection of the statute. Like, for instance, if you go into chambers,  You would be protected. But the question is, do I have any private conversations as a public official in a public building? That's another issue, too. Is there anything that's private in a public building as a public official? And the same – that's really what we're talking about. This person's in custody, from what we can see. They've been Mirandized. They're in the lineup. They're in jail. It's just very difficult to say that the Fourth Amendment doesn't apply for purposes of this statute. It's very hard to – To work that out. The case law is clear. This provides greater protection than the Fourth Amendment. I mean, you know, we can talk about why the legislature decided to enact this rigorous statute, but I don't really think that's relevant here. The statute is the statute. And, I mean, personally, I think there's a lot of benefit to providing more protection, more privacy than the Constitution applies. There's been a lot of scholars who think, you know, well, the states should now – you know, there's been a lot of erosion. People complain about the erosion of Fourth Amendment protections. And some scholars say, let the states step in. That's what Illinois did. And Congress explicitly allowed them to do that, and they did that. And I think that we have to honor that. And unless there's an exemption, that applies. And, you know, I think implied consent, all they have to do is say, we can hear you. They can put a sign up. You know, most jail phones – and not from experience – but there's a sign that says, you know, your conversation is recorded. You know, when the telemarketer calls you, they say, this conversation may be recorded. It's not that hard. There's really no cost to follow the statute if you think about it. That's why – let me go back to my original question. If you're in a room and there's a big black box up on the wall, and it looks like an intercom type of box, and you know from just your life experiences that somebody's – you know, they can speak to you. They can probably hear you. Is that – and you start making statements where, you know, they could be overheard. Is that implied consent? I do not think so, Your Honor. I think that would be basically, you know, violating the statute because all of a sudden the statute has said – does and does not apply. It applies in this situation. You know, implied consent must come from some factors, I think, beyond – I mean, we don't know exactly what was going on, why he was speaking, but you can assume he didn't know he was being heard. Is it any different than if you're – the example you're talking about, a person's sitting there and he's talking through the glass to his lawyer or his wife, and there's a guard standing behind him and says it may be recorded or may be overheard, and the guard hears him say, you know, make sure that you get that guy so he never testifies against me or something like that. There's no – he certainly knows that someone's listening to him, and he should be careful about what he says. I mean, is there – would you say that's covered by the eavesdropping statute, that it would not be admissible with the guard over her? Well, the guard over here – I mean, the eavesdropping statute covers – Transmission of – Eavesdropping device. It has to be some device – He's speaking over the phone, so someone would argue he's speaking over the phone. What if his voice is very loud and they can hear him on the other end of the phone saying, get that guy? Well, then I don't think you're using the eavesdropping device, and so the statute wouldn't apply. I mean, it has to be a device capable – So you're saying an intercom is an eavesdropping device? Clearly. If you look at the definition of eavesdropping device, it's any device capable of hearing or recording any oral communication. So Detective Cepeda did testify. If it was off, he couldn't have heard him. I mean, a telephone would fall into that definition, but – Scores of grade school children might have a class action under the statute if they've been listening to him, right? If someone is recording – Well – Just a thought. We all were in classrooms when, you know, the voice came over the box. This is Sister Bernice, and I hear everything you're saying, and please report downstairs. Yep. But your time is running. Okay. I guess then I will stand on the issue set forth in my brief on immigration bias, or if you guys have any questions – If you want to make a comment about the other issue, go right ahead. Okay. Well, I would just like to say that a defendant has a constitutional right to an adequate voir dire that will ensure that an impartial jury is empaneled. In this case, the defense counsel clearly thought immigration bias might be an issue, so he attempted to question the jurors to find out if there was a bias, and apparently there was a lot of bias because a lot of people raised their hands and said yes. And then the trial court redefined bias in such a limited manner that it basically stopped his ability to inquire about bias and find out to make sure he could exercise his peremptory challenges in an intelligent manner. I think that you're entitled to question jurors about areas of intense controversy. I think immigration is clearly an area of intense controversy. Our personal experience would tell us that, but I think if you just look at this record, I mean, the judge told the jurors that the only bias you have to expose is if you would convict solely because someone's an illegal immigrant or acquit solely because someone's an illegal immigrant. He said you can hate him, you don't have to disclose that bias. Under that extremely limited definition, three jurors still said, yes, you know what, I'm so biased against illegal immigrants, I would convict solely on immigration status. So I think this record establishes that this was an area of intense controversy. The defendant was entitled to have questions. I think I'm getting the cue there. I'm sorry, I just have one quick question for you on that issue. The court also, though, went on with each person and said you can be fair and impartial. And I think a couple of people said initially, oh, that would bother me if the person was an illegal immigrant, even though Mr. Perez is not. Correct? He's not illegal. He wasn't illegal. I don't believe that any record established that he was, but I think at this point all the jurors would infer. Well, bring that up. That's why it's a two-edged sword. But anyway, my understanding is that a couple of the people said it might create a bias for me, and then when the judge talked further with them, they said, you're right, I can be fair and impartial. I mean, they all said that. No one said I will continue to be biased, and the person was left on the jury. That didn't happen. Yes, but here's what I'd like to say is that the judge said the only bias you have to disclose, and even said you could hate illegal immigrants and not disclose that. I think that clearly is. But the judge had said repeatedly, you still have to be fair and impartial. But that's how she defined fair and impartial, only if you would convict solely on the basis of their status. No, I think that's how she defined bias toward illegal immigrants. I think she continued to say, you know, fair and impartial, fair and impartial with everybody. You can still be fair and impartial even if you, you know, she said at one point, everyone has biases, but you can still be fair and impartial to these defendants. Can you do that? And they said yes, as I remember. Correct me if I'm wrong. Well, but you're right, Your Honor, but I believe that before that when she said, when defense counsel asked the question, she said it's got to be a little more focused, Your Honor, the counsel, and then she said, here's what fair and impartial means. Here's what I define it as. If you would convict. So I think once you've got that definition of fair and impartial. How else can we be fair and impartial under that definition? Under that definition, and it's, you know, I think that everyone would have a right to not be tried by people who hate them, and to tell the jurors that it's okay to hate and don't, you don't have to disclose that. I just do not think that's an adequate vordict. I don't think defense counsel is able to adequately exercise its purgatory challenges and for cause challenges. Thank you. Thank you, Your Honor. Thank you. Good morning. May it please the Court. Statutes are not created in a vacuum, and certainly in this case, as far as the eavesdropping statute is concerned, it should not by any means be separated from a Fourth Amendment analysis. People v. Coleman tells us that. The Illinois Supreme Court specifically discussed that issue, albeit under slightly different circumstances. But his assessment is this. If this statute provides more guarantees than a regular Fourth Amendment analysis, why should the statute in this situation be cut back if it's been analyzed against a Fourth Amendment analysis? That's what he's saying. He's saying, look, you know, it's providing more protection. Sure. And if the legislature wants to do it that way, who are we to say, wait a minute, legislature, even though you gave them more rights, we're going to cut it back. You can't do that. Yeah. Exactly. But the legislature did not intend that, and a review of the legislative history shows that one of the overriding concerns for creating this highly stringent eavesdropping statute in Illinois was so it would prevent illicit eavesdropping and kind of sui sponte eavesdropping by the police. And it would inherently protect Fourth Amendment search and seizure rights. So looking at the legislative history, it did not in any way conceive of a situation like this, where a defendant comes into, he's sitting inside of the lineup looking at a mirror. He's about to be identified. And I'll go so far as to say he took a calculated risk that no one would actually understand him, that no one would understand when he spoke in Spanish, he didn't make the statement in English, that he took a calculated risk by turning to his co-defendants and saying, you shouldn't have opened your mouth and talked to the police. That is not under the statute. Further, the statute, for four reasons, it doesn't apply. One, there was no conversation. It was just a statement that he made to his co-defendants. They weren't talking. They were lined up and they walked into the lineup room. Second, the use of this eavesdropping device, if it can even be called that, was not knowing and intelligent. Detective Cepeda was in there waiting for witnesses to come in. One of the witnesses was going to identify the defendants from their backside. So obviously there has to be a device so he can say, please turn around at this point. So there was no intelligent and knowing use. He wasn't trying to eavesdrop. It was a practical use of a device. Third, implied consent. Absolutely. Justice Gallagher, you asked, are they generally visible? Yes, they are. And I haven't been in that particular room, but generally they're up on the wall. There might be two. They might be in the middle. This was not concealed in any way, shape, or form. And certainly in the police station, we are not at such a high technological level that these are giant intercom systems. This was not some highly technological place where it would not be visible. And the fourth reason is this isn't an eavesdropping device. It wasn't used for eavesdropping. It was used for the purpose of informing anyone who's standing in a lineup to turn around, to say something. It was used as a means of communication. Far cry from what the eavesdropping statute says. Two of the elements within the eavesdropping statute under 141A is that it needs to be knowing and intelligent. We absolutely don't have that factor in this case. And it does need to be analyzed in terms of Fourth Amendment, because it's ludicrous to say that in a police station, after he's been Mirandized in Spanish multiple times, that he has any right to expectation of privacy. As Justice O'Brien, you pointed out, it is a public building. Not only is it a public building, but he's just been arrested for a murder-for-hire plot. And he knows that he's standing in a lineup. In addition, there's two complete strangers there that he doesn't even know. There's no expectation of privacy. It's an even easier case than People v. Ceja, where the two co-defendants were sitting and talking to each other, having an actual conversation, and they didn't know at first that it could be overheard. There was no one else there in the room. Exactly. And then they were actually informed, hey, we can overhear you, and they continued to talk. This is an even easier one. He's not talking to anyone. He just makes this spontaneous declaration. And if somebody had been able to read lips in Spanish, that could go in. Absolutely. There would be no question. We wouldn't even be here. Or if one of the officers, now, interestingly, it was Officer Cruz that acted as the translator here. So it can be assumed that the defendant knew Officer Cruz spoke Spanish. He didn't know that Officer Cepeda was behind the mirror and that he could speak Spanish, too, and it was a different officer that led them into the room. So he actually just made a calculated risk that no one can understand me. There was nothing to say that the two other individuals that were in that room that were the fillers couldn't understand Spanish. It was a decision he made, and now he's trying to hide behind the statute, which in no way was intended for a situation like this. I mean, the precedent from reversing this under the statute would be that any time a defendant is in a lineup, whether he makes a spontaneous statement or not, police are precluded from having any type of device, even one that was for purely communication, not an eavesdropping device, just like in the penal system. Nothing prevented them from turning the device over, off, correct? No. Turning it off before they came in? Well, turning it off when they didn't need to communicate with the people in the room. They weren't prevented from doing that. No, no, not at all. The record shows that Officer Cepeda, when he came into the room to wait for the witnesses, was not aware that the device was actually on. But at the moment that the statement happened, all of the defendants were seated. So at that moment, he was going to click that switch on, even if it was off. But is it your position that if the device has a dual purpose, that is, you can use it to communicate, but you can also overhear what people are saying, then it doesn't qualify as an eavesdropping device? Oh, no, my position is this is by no means an eavesdropping device. This is a device for communicating between police officers and arrestees. It's not a device for eavesdropping at all. Whether it's on or off does not put it within the purview of the statute by any means. So the fact that he could hear what was going on, it doesn't qualify as an eavesdropping device? Exactly, exactly. It does not qualify as an eavesdropping. For it to be eavesdropping under 141A, it has to be used knowingly and intelligently in order to eavesdrop on a conversation. And here there was no conversation. Wait, are you saying it was used knowingly and intelligently, or are you saying it was not an eavesdropping device? I'm saying all four. It was not used knowingly, intelligently, if you assume it's an eavesdropping device. It does not qualify under the statute because there was no communication. There was no conversation. This was simply the defendant making a statement. And one of the elements in the statute is it has to be a conversation, as defense counsel already defined. It's a conversation between one or more people. There's no conversation here. This is the defendant simply making a statement. His co-defendants are talking to him. So that's two. Under the third one, it's implied consent. He's consenting, and it's an implied consent under that. So it does not qualify under the eavesdropping statute. In SEHA, wasn't that an eavesdropping device that was the same kind of intercom type of thing? I'm sorry? In SEHA, wasn't that an eavesdropping device? Wasn't it considered to be by the court? Oh, no. Even though it was like an intercom type of? Well, no, it was a situation where it was used for communication under SEHA. And the defendants were actually told, we can hear you, and they continued to have this conversation. But my question is, I mean, it was the same type of a system, wasn't it? Oh, yes, yes. An intercom system. It was an intercom system. And they didn't really dispute that that was a device under the eavesdropping statute. That really wasn't the issue. Yeah. I mean, it was sort of assumed that it was an eavesdropping device. Correct. Right. And even if this court were to assume this is an absolute eavesdropping device, it still doesn't qualify under the statute. It's not a conversation. Whether you use conversation as a noun, as a transitive verb, or as an intransitive verb, it's not a conversation between two people. It's the defendant simply saying, you should have kept your mouth shut and not talked to the police. So even under the statute itself, only looking at the four corners of it, it wouldn't qualify. It's getting very technical. Now you're saying that there is a response. Correct. What if he nodded, if you know, for a conversation? But he didn't. He didn't. And even if he nodded. It does say conversation. Pardon? It does say conversation. It doesn't say statement. It says a conversation. A conversation. Exactly. Exactly. And under the legislative history, one of the overriding concerns was that there is not an erosion under the Fourth Amendment for improper speech. And that is why there is a lot of searches and seizures and illicitly eavesdropping on people. So it should be analyzed first and foremost under Fourth Amendment. And if it's not, even under the statute itself, it certainly doesn't qualify. What you're saying, to take it a little bit further, this couldn't be used against the codefendant because he didn't say anything. I mean, in other words, it wasn't an admission. No, it wasn't an admission. No. No, it's being used against, it was used against the defendant. It was used against the speaker, not the person who is listening. Correct. Unless he said, you're right, I should have kept my mouth shut. Right. Right. Why did I confess? Exactly. Exactly. And as to the last issue with the bias in the voir dire, as you noted, Justice Gallagher, there was every reasonable assurance that was made by the trial court to make sure that there was no bias or prejudice. In fact, there were five jurors that were stricken off the veneer panel when they raised their hands and said, because of a person's immigration status, I cannot be fair and impartial. Only one juror actually remained. So the judge actually went above and beyond the duty, asking the jurors, can they be fair and impartial. But the definition was somewhat narrow to say you can hate somebody, but you can't make your decision based upon their immigration status. I mean, I think the judge probably would have liked to have had those words back and say, you shouldn't hate anybody. Right. If you hate somebody, tell us, and we'll let you go from that, too. Exactly. I mean, you can't sit there and say, I hate you, but I'm not going to let your immigration status affect the fact that I'm going to vote to convict. That's true, but it was also followed by the defense attorney making the statement that the defense attorney made and asking regarding a strong bias. And the judge actually did say the only issue is whether or not it will affect your ability to be fair and impartial. So the concept of fair and impartial right was constantly reaffirmed with the jury. And like I said, five were stricken, only one remained. But is there a hangover, the voir dire, the cloud of it's okay to hate somebody as long as you don't base it on their immigration status? Is that still out there hanging? That's what your worthy opponent is saying? Well, it would only be hanging as to the one juror who already indicated that he could be fair and impartial. It was only as to that one juror. After that, he said, I can still be fair and impartial. Exactly, exactly. And no juror ever said, I hate people who are illegal? No, none of them actually said any of that. So the word hate only comes from the trial court. Correct. So the trial judge's determination in this case should be affirmed because the judge took every step that needed to be taken in order to make sure that there is every reasonable assurance that there is no prejudiced jury in this case. Thank you. Thank you. Any rebuttals? Just briefly. Conversation in any oral communication. There's no requirement that you have some sort of dialogue back and forth in oral communication. What section are you on? 14.1c, or I'm sorry, d. Read that sentence out loud. The term conversation means any oral communication between two or more persons, regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation. So she's saying, you know, this doesn't apply because it's not a conversation. It was a statement that was done. He was talking to his co-defendants. That's a conversation, a communication between. It wasn't a soliloquy. It wasn't an aside. He was talking to his co-defendants. They didn't speak back, though, did they? I don't think that's required. I don't think that this statute could be circumvented by, yeah, we illegally tapped your phone, but, you know, we just listened to your side of it and no one responded. The statute is not going to be able to. We're loquacious, so it doesn't apply. And just briefly, it seems like there's some resistance to accepting that the statute provides more protection than the Fourth Amendment. Every case that's cited by either party recognizes that. The plain language recognizes that. And there is no great cost here to not listening in to people when they don't know they're being listened to. I think the problem we're having is that you're saying that it can't be analyzed against the background of the Fourth Amendment for purposes of your defendant. But I'm assuming you would get up and say that if it was going to cut the other way, that, oh, yeah, the Fourth Amendment analysis has still got to be there. Just saying, once we say the statute is not against the backdrop of the Fourth Amendment, then down the road it could really hurt your guy. And if it does, then you're stuck with that, too. I'll cross that road when I come to it, but I think that the statute provides protection. You're saying at this moment, for this statute, he doesn't have any Fourth Amendment analysis with this statute. And it's pretty tough to say that the guy's in custody and he's been Mirandized, and you want us to say that the Fourth Amendment protections are, we're not going to analyze it against it. That's perpetual to what we all think as lawyers. You always have the Fourth Amendment with you at all times. And if you do, then the statutes that go on top of it are analyzed with those protections with you. Because it sounds as if you want us to let those go regarding the person who's in custody. I'm just afraid the language could be twisted and say, wait a minute, the appellate court said that he doesn't have the protection of the Fourth Amendment, or it's analyzed without the protection of the Fourth Amendment. No, if this was a Fourth Amendment violation, we would obviously have a totally different argument. And I think if the Fourth Amendment is the be-all, end-all, if it's co-terminated with the Fourth Amendment, there was no reason for the legislature to pass this statute. We would just say, let's look at Fourth Amendment jurisprudence. They consciously, they've amended it to provide greater protection. And I think all the cases acknowledge that. That was the purpose. There's nothing to prevent the legislature from saying, we're going to give you more protections than the federal constitution does. No, that was explicitly allowed in the Federal Omnibus Crime Bill. On more than one occasion. And just one last thing, you know, I don't, you know, the idea that maybe he was dumb for talking still does not justify over here. And it has to be implied consent. There are no factors that by present I can say how that you can say here that, you know, would establish implied consent. Thank you, Your Honor. Thanks very much. We'll take the case under advisement and we will.